The next case today is Wissam Mahmoud v. William P. Barr, appeal number 191777. Attorney Olin, you may proceed. Thank you. Good morning, Your Honor. May it please the court, Randy Olin for Wissam Mahmoud. Your Honor, may I reserve four minutes of my 15 minutes for rebuttal? I'm sorry, but I have that you have 10 minutes time, not 15. Please, you have 10 minutes. How much do you want to reserve, if any, of that 10 minutes? Two minutes, Your Honor. Yes, you may have two minutes. Thank you. Mr. Mahmoud is a 47-year-old native and citizen of Lebanon who entered the United States as a permanent resident in 1991 at the age of 19. For the next 17 years, he lived with his nuclear family, all of who are citizens or permanent residents, and for the next 17 years, he worked as a restaurant manager for his brother, Caldoun's restaurant. When the Great Recession hit, Caldoun sold his restaurant and moved to Canada to open a new one. Caldoun is a United States citizen. Mr. Mahmoud stayed in the United States for about a year trying to find suitable employment. When he could not, he agreed to join his brother in Canada on a temporary basis to work in his restaurant until he could find a better opportunity or if his family would open a new restaurant in the United States. While he was away, he returned to the United States every year to visit family and to check out employment opportunities. In 2013, he married a Canadian citizen of Lebanese descent in Lebanon. At that same time, his other brother, Baha, was opening up two new restaurants in the United States. After the wedding, Mr. Mahmoud went back to Canada in order to settle his affairs and moved to the United States to work for Baha. However, within a few weeks of returning to Canada, he became gravely ill and nearly died of listeria meningitis and rhomboencephalitis. He was in a hospital for four months and rehabbed for six months. After that period, as soon as he was discharged and could travel, he attempted to return to the United States where he was stopped and denied admission based into removal proceedings based on a charge that he had abandoned his permanent residence. In order to qualify as a returning lawful permanent resident, you must have acquired lawful permanent resident status, retained that status, and be returning to an unrelinquished lawful permanent residence after a temporary visit abroad. So what's a temporary visit? In this court's seminal case in Katibi, it announced certain formulations. The one that's relevant to this case is that he would still be considered a returning lawful permanent resident rather than someone seeking admission if his visit would terminate upon the occurrence of an event having a reasonable possibility of occurring within a relatively short period of time. But if that event did not occur within a reasonably short period of time, he would still be a returning lawful permanent resident if he had a continuous uninterrupted intention to return to the United States during his period of absence. Mr. Rowland, having just summarized the standard, is it your position that the immigration judge and the BIA failed to articulate the proper standard of law that they said they were applying? I do believe that the agency completely misread the burden of proof that's required, that the government is required to meet, and I also believe that the various factors to be considered, family ties, business ties, property ties, and anything else that's relevant to the analysis, are completely in favor of a finding that there was not. Let me break that down in two pieces. Could you point to me where in the BIA decision it goofed up in saying what the standard of law is that it should be applying? Five minutes remaining. I don't know that they didn't enunciate the standard. What they didn't, however, Your Honor, is completely ignore it, and in reviewing the relevant factors, did not apply them properly. For example, and if I could just say, Your Honor, very quickly, probably the most important aspect of this petition is the government's burden of proof. When a non-citizen has a colorable claim to returning lawful permanent resident status, the government has the burden to show by the clear, unequivocal, and convincing evidence standard that he has not abandoned his residence. The United States Supreme Court has spoken to that standard and said it's evidence which does not leave the issue in doubt. In Schneiderman. Mr. Olin, can I turn to the facts? The Great Recession of 2008 did not eliminate restaurant jobs, including restaurant management jobs, until 2013. Let's assume we'll as the end point. What is the evidence in the record that your client actually was looking for restaurant jobs outside of employment by his brothers, should they open a new restaurant? Primarily, Your Honor, let me just say that he enjoys a presumption of credibility, because there was no adverse credibility finding made, and his testimony repeatedly indicated that he was consistently looking for work during that period of time. What specifically? Sometimes he's back just for a weekend. Sometimes he's back longer. What specifically did he say other than that general statement? Did he offer any job applications? Did he describe any interviews anywhere? First of all, Your Honor, and that's one of the points the government erroneously makes, he's not required to do so under the relevant standard. His credible testimony is enough. I'm sorry. You're saying that the subject matters I'm inquiring about are irrelevant, because he had no burden of proof whatsoever? No, Your Honor, but I think that's burden shifting. Would you please go back and answer my question? You put him on the witness stand. What did he say about looking for a job over that period of five years of absence from the U.S., looking for a job in the U.S. for people, working for people other than his family? His credible testimony, Your Honor. What was that testimony? I looked for a job, period. On his returns to the United States, he did two things. He visited with his family, and he sought employment. He checked into the employment opportunities in the United States. Did he say anything more than I checked into employment opportunities? Did he provide a list of people that he spoke to over the four months that he was in the United States during this period? No. I'm sorry. Is your contention it was only during the four months is made up of a series of very short visits and a longer visit? Is that correct? That's correct, Your Honor, yes. And what was the longest visit? I think probably a month, although I'd have to check the record, but somewhere around a month. Mr. Olin, understand that the evidence against you, which includes the substantial amount of time that he lived in Canada, his purchase of a home there, his employment status there, his marriage to a Canadian woman, even if she was of Lebanese descent, that's all evidence against your client. Wait a minute, hang on. I'm sorry. What Judge Lynch is trying to find out is we understand that the burden is on the government, but we're trying to figure out what evidence you put into the record that would weigh in your favor. With the understanding that half the people these days find employment online, so there's nothing that prevented him from looking for a job from Canada in the United States. And there's no evidence that he did not do so, Your Honor. We don't know that. We're trying to figure out what evidence is that he did. Is it just a general statement that I looked for work? Yes, that's his testimony, Judge. That's his credible testimony. Let's be precise what the IJ said. The IJ said, though, he starts off the sentence with the word though, the respondent testified that he attempted to seek employment on his various trips to the or sometimes a month. Some were sure the time spent outside the country is time that could have been spent finding alternate employment, just what Judge Thompson just said to you. So I'm not so sure the record here is one where the IJ just accepted an assertion that he was always looking for jobs. It seems that he rather says to the contrary. Frankly, Your Honor, I think we're missing the forest for the trees. There's no indication that he did not look actively for employment as he said he did. But may I address very quickly what Judge Thompson has asked about the things in his favor. If you look at the case law, it's almost monolithic in that where abandonment has been found, there are tenuous ties at best to the United States. This man spent 17 years living with his nuclear family, spent 17 years working for his brother in the United States. Those are hardly tenuous ties. Aside from that, Your Honor, he got temporary work permits only. He did not want any type of status in Canada. He took no stake in his brother's business. He never saw any other status even after he got married. His consistent, credible testimony was that he always intended to return to the United States. His annual trips to the United States to visit his family, as I said, an employment prospect. He renewed his Rhode Island driver's license. He renewed his alien registration green card. He testified that he was dissatisfied living in Canada. He filed petitions for his lawful permanent resident status for his wife and son. He married his wife in Lebanon, not Canada. He intended to return at all times to the United States permanently, and he did so at the first opportunity as soon as his brother opened the new restaurants, except for the fact that his illness kept him for almost a year from coming back into the United States. The evidence that the government and the agency relied on can all be explained. Every single one of those factors that he bought a home in Canada, well, he testified that the rents were very high and he bought it as an investment as well, that he did not own a home in the United States. He didn't need a home in the United States. He lived in his family home for 17 years. That's a positive equity, not a negative factor that he married his wife. He married her in Lebanon, not Canada. I know of no authority, nor does the opposition give any, for the proposition that a lawful permanent resident cannot marry while he's on a temporary visit abroad. With respect to the conclusion that his trips to the United States were not long enough for a reasonable search for employment, that to me is rank speculation. No one knows. How do we know how much time he spent? No one asked him how much time he spent. He credibly testified that he was looking for work. Perhaps the most important aspect that the government relies on is the erroneous finding by the board that he remained in Canada after his brother opened restaurants in the United States. My reply brief does the math on this and he testified that he worked in Canada before those restaurants were opened in the United States. As soon as they were opened, he attempted to return to the United States, his home. Counsel, I thought the record was actually more ambiguous than that. We do know that in, I think it's late 2013, his brother, a different brother opens two restaurants, but I don't think there was any evidence as to whether any member of his family had opened a restaurant before then. That's one question. The second question is the picture that gets painted is he looked for a job within the family, assuming they would open new restaurants, but he did not look for a job outside of his family. Can you address both of those points? Yes. The first point, Your Honor, is that his brother didn't open a restaurant before. That's the whole point. As soon as his brother opened, he worked for his brother in Canada until his brother, right? I'm sorry, a different brother. Yes. As soon as he opened those restaurants, he tried to get back to the United States after his illness. No, I believe what the record shows is that when in 2013, the brother opened the restaurant, but there's no information that there was no opening of a restaurant before then. No, and that works in his favor, Your Honor. I understand you're going to say the government bears the burden, but what about the second point? I'm going to say if he had opened the restaurant earlier, then the government would have a good point. Why did you stay in Canada if your brother opened restaurants in the United States? The fact of the matter is his brother didn't open those restaurants in the United States until he became sick and couldn't leave the country. So that's a huge point in his favor. With respect to your second point, Judge, I'm sorry. There's no evidence in the record that he waited only for his family to reopen a restaurant. That's what happened. His family was in the restaurant business their whole lives, but there's nothing in here to indicate that when he says, I searched for employment opportunities in the United States, that they were limited only to... Is that time, Your Honor? Oh, I thought I heard it. That they were limited only to... You're way over time. I'm sorry? You're way over time, but you can finish your answer, I suppose. There's nothing to indicate that his job searches were limited to waiting for his brother or someone in his family to open a restaurant. Okay, counsel. Thank you. Thank you very much. Ms. Braga. Oh, I'm sorry. Ms. Braga, go ahead. May it please the court, Victoria Braga appearing on behalf of the Attorney General. The court should deny the petition for review because substantial evidence supports the agency's abandonment finding. The court reviews the agency's decision deferentially under the substantial evidence standard. The court is asking whether it was reasonable for the agency to conclude that the DHS had met its burden of showing that Mr. Mahmoud had abandoned his permanent residence. Here, the record supports the agency's conclusion. The agency appropriately analyzed the factors that this court has said are relevant to a person's intent when they spend a considerable amount of time outside of the United States as Mr. Mahmoud did while he was a lawful permanent resident. The agency analyzed Mr. Mahmoud's family ties and found that while he did have family ties in the United States, beginning in 2008 when he went to Canada, he began to develop family ties there. He is married to a Canadian citizen and his son was born in Canada and is also a Canadian citizen. The agency also analyzed Mr. Mahmoud's property ties. Mr. Mahmoud never owned property in the United States. However, in 2012, notably at the time that his Canadian work visas were expiring, he bought a house in Canada. And finally, Mr. Mahmoud's business ties. Although Mr. Mahmoud worked in the United States between 1991 and 2008 and also paid taxes during this period, in 2008 he stopped working in the United States and began working in Canada. Petitioner spends much time indicating that Mr. Mahmoud returned to the United States when there was a business opportunity available to him there. But as this court has recognized today, Mr. Mahmoud did not return to the United States as soon as practicable, which is the standard announced by this court in Katebi. Instead, Mr. Mahmoud remained outside of until 2013 when, according to him, his brother opened a restaurant, which he began working in, in 2015. As the court has recognized today, the record is not clear that Mr. Mahmoud's brothers did not own any restaurants in the United States prior to 2013. There's minimal testimony on this and there is no documentation in the record showing that his brothers did not own a restaurant in the United States prior to 2013. Additionally, there's no evidence in the record that Mr. Mahmoud searched for employment other than in his brother's restaurants prior to 2013. Again, this goes back to the practicable standard in Katebi. If Mr. Mahmoud was truly intending throughout his time in Canada to return to the United States, it was reasonable for the agency to assume that he may have looked for employment outside of in his brother's restaurants. Well, was his testimony that specific, Counselor? Did he specifically say, I only looked for work to my brothers, or did he say, I tried to find a job in the restaurant industry in the United States? His testimony is more general in that he claims that he was attempting to look for work in the United States when there was an employment opportunity available at one of his brother's restaurants. So the testimony on that point, I think goes both ways. And ultimately, he only returned to the United States when there was a job opportunity available for him at his brother's restaurant. As the court has recognized, there are many factors here tending against a finding that Mahmoud did not abandon his permanent residence, notably his time outside the United States, his family ties in Canada, and his property ties in Canada. It was reasonable then for the agency to ask him to put on rebuttal evidence to show that his intent was always to return to the United States. And the evidence that he put on, as we argue in our brief, shows that while he may have always hoped to keep open the possibility that he would one day return to the United States, it can't be found based on this record that between 2008 and 2013, at the time he spent outside the United States in Canada, he had a continuous and uninterrupted intent to return to the United States as soon as possible. If there are no further questions, for those reasons, we would urge the court to find that substantial evidence supports the agency's decision that Mr. Mahmoud abandoned his lawful permanent residence. Thank you. Thank you. Attorney Olin. Thank you. Let me just comment on one other factor which the government relied and the agency relied very heavily on, and that is that he did not, Mr. Mahmoud did not apply for a reentry permit to get back into the United States. Well, you don't need a reentry permit unless you're out of the country for more than one year. He never intended to be out of the country for more than one year, as evidenced by the fact that every year he came back to the United States. So he didn't need a reentry permit, he only needed it because of his year-long illness. That's what kept him from coming back into the country. Beyond that, Your Honor, in Arevalo v. Ashcroft, this court said, we reject an interpretive rule that would require courts invariably to construe all immigration statutes in the most draconian manner that their words conceivably could If you look at the totality of circumstances in this case, the 15 positive factors I quickly mentioned, the legitimate responses to what the agency relied upon to find abandonment, in my mind, there is no possible way that you could meet the daunting, clear, convincing, unequivocal standard. The decision of the Board should be reversed in this case, and the case remanded so that Mr. Mahmoud may reenter the United States as a returning lawful permanent resident. Thank you. Thank you. That concludes arguments for today. This session of the Honorable United States Court of Appeals is now recessed until the next session of the Court. God save the United States of America and this Honorable Court. Counsel, you may disconnect from the meeting.